******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ISMAIL H.
ABDUS-SABUR
(AC 41515)

Keller, Prescott and Pellegrino, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of murder and criminal possession of a firearm in connection with the shooting death of the victim, the defendant appealed to this court. He claimed, inter alia, that that there was insufficient evidence to support his murder conviction because the state did not establish that he had the specific intent to cause the death of the victim. *Held*:

1. The defendant's claim that there was insufficient evidence to prove the specific intent element necessary to support his murder conviction was unavailing: the jury reasonably could have inferred from the evidence and testimony that the defendant had the requisite intent to kill, as an intent to kill could have been inferred from his use of a deadly weapon when he repeatedly shot a firearm into a group of people who were standing together within a close range, striking and killing the victim, and the shooting followed an altercation earlier in the night between the defendant and the victim's two sons and, thus, the defendant had a motive to seek retribution; moreover, there was evidence of the defendant's conduct after the shooting from which the jury could have inferred an intent to kill, as the defendant threatened the victim's sons the day after the shooting, and the defendant displayed a consciousness of guilt by immediately fleeing the scene following the shooting, travelling out of town the following day, and leaving the state later that week.

2. The defendant could not prevail on his claim that the court improperly denied his request for a third-party culpability instruction, as the defendant did not establish a direct connection between the third party, C, and the offense with which the defendant was charged; the only evidence before the jury suggesting that C was the shooter was the testimony of a witness that another person had told her that C was the shooter, which was admitted as a prior inconsistent statement for the sole purpose of impeaching the witness, and defense counsel conceded at oral argument before this court that there was no evidence regarding C's culpability that was admitted for substantive proposes.

3. The defendant's claim that the trial court abused its discretion in admitting into evidence testimony regarding the defendant's alleged gang affiliation, which he claimed constituted improper uncharged misconduct evidence, was not reviewable; the defendant failed to address in his principal or reply brief to this court how the allegedly improper admission of the uncharged misconduct evidence constituted harmful error, and although he addressed the prejudicial effect of the uncharged misconduct evidence in his principal brief, prejudicial effect and harmful error are not necessarily equivalent and must be briefed separately.

Argued February 11—officially released June 18, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of murder, manslaughter in the first degree with a firearm, and criminal possession of a firearm, brought to the Superior Court in the judicial district of Waterbury and tried to the jury before *Cremins, J.*; thereafter, the court denied the defendant's motion for a judgment of acquittal as to the count of murder; verdict and judgment of guilty of murder and criminal possession of a firearm, from which the defendant appealed to this court. *Affirmed.*

*Jodi Zils Gagné*, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Cynthia S. Serafini* and *Don E. Therkildsen, Jr.*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Ismail H. Abdus-Sabur, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). The defendant claims on appeal that (1) there was insufficient evidence to prove beyond a reasonable doubt that he possessed the specific intent to kill, as required for the crime of murder, (2) the trial court improperly denied his request for a third-party culpability instruction, and (3) that the court improperly admitted evidence of his gang affiliation. We disagree and, accordingly, affirm the judgment of the trial court.

The facts, as could have been reasonably found by the jury, and procedural history, are as follows. On the evening of January 17, 2014, the defendant was at an apartment on the third floor of a Waterbury housing complex known as "Brick City." The defendant's friends, Arvaughn Clemente and Daniel Clinton, were hosting a house party at the apartment. The defendant's brother, Isa Abdus-Sabur (Isa), and Ryan Curry, Sthalron Freeman, and Katrina Montgomery were also in attendance. Clemente was dating Ja-Ki Calloway, who was also in the apartment. Calloway's father, Kareem Morey, Sr. (victim), rented a second floor apartment in the same complex, where he resided with his adult son, Kareem Morey, Jr. (Kareem). On the evening of January 17, 2014, his other son, Kentrell Morey, was also at the housing complex.

That night, Calloway's brother, Kareem learned that Clemente had assaulted Calloway, and became angry. Kareem and Kentrell then presented themselves at the third floor apartment and demanded that Calloway leave the apartment, but she refused. Kareem wanted to fight Clemente for having assaulted his sister. A verbal altercation then ensued between the Morey brothers and the men inside the apartment, which spilled onto the landing outside the apartment. The altercation escalated into a fist fight between a number of the party attendees and the Morey brothers.

After the fight ended, the Morey brothers, upset by the altercation, left and walked to a nearby neighborhood to recruit additional people to renew the fight. They also called the victim, who had not been present at the initial altercation, and he informed them that he would return home. When the Morey brothers left, the partygoers returned to the third floor apartment. At this point, Montgomery overheard the defendant mention a gun to the other men at the party.

At about 10:30 p.m., the Morey brothers returned to Brick City with four additional men. Around this time, the victim also returned and parked his car on the street outside of the housing complex. The Morey brothers

then entered the interior courtyard of Brick City through a passage from the street and climbed the stairs to the landing outside of Clemente and Clinton's third floor apartment. The victim remained standing at ground level in the courtyard near the foot of the stairs. The Morey brothers began kicking Clemente and Clinton's apartment door. Eventually, the door to the apartment opened, but all the lights were off inside the apartment. Shortly thereafter, Kareem heard the "click, click" sound of a gun. The Morey brothers then fled by descending the stairs toward the courtyard.

As the Morey brothers retreated down the stairs, the occupants of Clemente and Clinton's apartment emerged onto the third floor landing overlooking the courtyard. Within the crowd on the third floor porch were the defendant, Isa, Clemente, Clinton, Curry, and Freeman. The defendant then began firing a black handgun from the railing of the landing toward the people in the courtyard below.

By the time the defendant started shooting, the Morey brothers had arrived at the bottom of the stairs, where the victim was standing. When the victim heard the first gunshot, he pushed Kareem out of the way. The victim was then struck in the chest with a .45 caliber bullet. He told his sons that he had been hit and ran out of the courtyard through the passage toward his parked vehicle. The victim was driven to St. Mary's Hospital in Waterbury, where he later died as a result of the gunshot wound to his chest.

Following the shooting, the defendant and Isa ran to the defendant's car and left Brick City. The next day, the defendant and Isa pulled up in a sports utility vehicle alongside Kentrell's girlfriend, Zyaira Cummings, while she was walking on a street near Brick City. The defendant then said to Cummings, "they're next," which she interpreted to be a threat against the Morey brothers, whom she then warned about the interaction. On January 18, 2014, the day after the shooting, the defendant fled to Southington. On January 21, 2014, the defendant traveled to New York City. That same day, the police obtained a warrant for his arrest. The defendant eventually turned himself in on January 27, 2014.

After a trial by jury, the defendant was convicted of murder and criminal possession of a firearm. The court sentenced the defendant to forty-five years of incarceration for his conviction of murder and two years of concurrent incarceration for his conviction of criminal possession of a firearm, for a total effective sentence of forty-five years of incarceration. This appeal followed.

## I

The defendant claims that there was insufficient evidence to prove beyond a reasonable doubt that he possessed the specific intent to cause the death of the victim.[1] We disagree.

The following additional procedural history is relevant to this claim. At the close of the state's evidence, the defendant made a motion for a judgment of acquittal, contending that the evidence was insufficient to prove beyond a reasonable doubt that he intended to cause the death of the victim. Specifically, defense counsel argued that the evidence that the defendant possessed and fired a firearm was insufficient to establish the requisite intent to cause the death of the victim. The court denied the defendant's motion.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Perkins*, 271 Conn. 218, 246, 856 A.2d 917 (2004).

"Because [t]he only kind of an inference recognized by the law is a reasonable one [however] . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . [T]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 93, 836 A.2d 224

(2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Citation omitted; internal quotation marks omitted.) *State* v. *Perkins*, supra, 271 Conn. 246–47.

"[I]t is well settled that the specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. . . . Because direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." (Internal quotation marks omitted.) *State* v. *Bennett*, 307 Conn. 758, 780, 59 A.3d 221 (2013).

Finally, "transporting a deadly weapon to the location where that weapon ultimately is used supports an inference of an intent to kill." *State* v. *Otto*, 305 Conn. 51, 71, 43 A.3d 629 (2012). Moreover, "an intent to kill can be inferred *merely* from the use of a deadly weapon on another person." (Emphasis added.) *State* v. *McClam*, 44 Conn. App. 198, 210, 689 A.2d 475, cert. denied, 240 Conn. 912, 690 A.2d 400 (1997). "One who uses a deadly weapon upon a vital part of another will be deemed to have intended the probable result of that act, and from such a circumstance a proper inference may be drawn in some cases that there was an intent to kill. . . . A pistol . . . or gun is a deadly weapon per se." (Citations omitted; internal quotation marks

omitted.) *State* v. *Rasmussen*, 225 Conn. 55, 72, 621 A.2d 728 (1993).

In the present case, the jury was presented with evidence that the defendant repeatedly shot a firearm into a group of people who were standing together within a close range, striking and killing the victim. Therefore, an intent to kill can be inferred based solely on the defendant's use of a deadly weapon on another person. Moreover, even if Kareem was the intended target, the fact that the defendant struck the victim does not undermine the existence of the necessary specific intent to cause the death of another person. See *State* v. *Gary*, 273 Conn. 393, 411–12, 869 A.2d 1236 (2005) (defendant who, under chaotic circumstances, shot bystander rather than intended target possessed intent to kill). "The doctrine of transferred intent operates to render a defendant culpable of the murder of a third person when the defendant causes the death of that third person with the intent to cause the death of someone else. . . . The principle, which is reflected in the express language of § 53a–54a (a),[2] represents a policy determination by the legislature that a defendant who engages in such conduct is no less culpable than if he had killed his intended victim." (Citations omitted; footnote added.) *State* v. *Courchesne*, 296 Conn. 622, 719, 998 A.2d 1 (2010).

Furthermore, the events leading to and immediately following the victim's death support a finding that the defendant possessed the intent to kill. The shooting followed an altercation earlier in the night between the partygoers, including the defendant and the Morey brothers. Accordingly, the defendant had a motive to seek retribution. See *State* v. *Gary*, supra, 273 Conn. 407 (evidence that defendant had been involved in altercation with intended victim on night of murder, and intended victim had punched defendant, supported inference that defendant had motive to kill).

Additionally, there was evidence that the defendant fled the scene directly after the shooting, travelled out of town the next day, and travelled out of state later that week. These facts are indicia of an intent to kill. See *State* v. *Melendez*, 74 Conn. App. 215, 223 n.5, 811 A.2d 261 (2002) ("[T]he defendant's fleeing the scene [of the murder] and subsequent flight to Puerto Rico are evidence of his consciousness of guilt. 'We have in the past considered consciousness of guilt evidence as part of the evidence from which a jury may draw an inference of an intent to kill.' "), cert. denied, 262 Conn. 951, 817 A.2d 111 (2003). Finally, there was evidence that the defendant threatened the Morey brothers the day after the murder by stating "they're next" to Cummings. This evidence further supports the conclusion that the defendant had the specific intent to kill.

In sum, from the cumulative weight of this evidence, the jury reasonably could have concluded beyond a

reasonable doubt that the defendant possessed the specific intent required for murder. Accordingly, we reject the defendant's claim that the trial court improperly denied his motion for a judgment of acquittal.

## II

The defendant next claims that the court improperly denied his request for a third-party culpability instruction. We disagree.

The following facts are relevant to this claim. Nunez, who lived in Brick City and was present at the shooting, identified the defendant as the shooter on several occasions during her testimony. Nunez also stated that she did not see anyone other than the defendant with a gun. Nunez was impeached, however, by a prior inconsistent statement that she admitted she had made to her friend, Queyla Martinez, that she did not see the shooter. She also testified that Kareem told her that Clinton was the shooter.

At the conclusion of the evidentiary portion of the trial, the court instructed the jury that the testimony of Nunez, Kareem, and Martinez given on December 7, 2016, that related to whether Clinton was the shooter was not substantive evidence in the case but, instead, could be considered only for impeachment purposes.[3]

Following closing arguments, but before the court charged the jury, defense counsel, contending that Clinton was the actual shooter on the night of the incident, requested a jury charge on third-party culpability. Specifically, defense counsel relied on testimony from Nunez that Kareem had told her that Clinton was the shooter.[4]

The court denied the request for a third-party culpability instruction. After the court charged the jury, defense counsel took an exception to the charge and renewed his request for a third-party culpability charge. The state argued that it would be inappropriate to give such a charge because the only evidence before the jury suggesting that Clinton was the shooter was admitted for impeachment purposes only. The court again declined to instruct the jury on third-party culpability, stating that there must be more than a mere suspicion that Clinton was the shooter, and that there was no substantive evidence that Clinton was the shooter in this case.

On appeal, defense counsel conceded during oral argument that there was no evidence regarding Clinton's culpability that was admitted for substantive purposes.[5] Moreover, the defendant does not challenge on appeal the court's decision limiting the testimony to impeachment purposes only.

"In determining whether the trial court improperly refused a request to charge, [w]e . . . review the evidence presented at trial in the light most favorable to

supporting the . . . proposed charge. . . . A request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, the trial court has a duty *not* to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence. . . .

"It is well established that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged. . . . The defendant must, however, present evidence that directly connects a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused. . . .

"The admissibility of evidence of third party culpability is governed by the rules relating to relevancy. . . . Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . Accordingly, in explaining the requirement that the proffered evidence establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, we have stated: Such evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of third party culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt. . . . In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination. A trial court's decision, therefore, that third party culpability evidence proffered by the defendant is admissible, necessarily entails a determination that the proffered evidence is relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt. . . .

"[I]f the evidence pointing to a third party's culpability, taken together and considered in the light most favorable to the defendant, establishes a direct connection between the third party and the charged offense, rather than merely raising a bare suspicion that another could have committed the crime, a trial court has a duty to submit an appropriate charge to the jury." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Arroyo*, 284 Conn. 597, 607–10, 935

A.2d 975 (2007).

In the present case, there simply was no evidence that tended to establish a direct connection between Clinton and the charged offense. The defendant cites only to testimony by Nunez that she had told Martinez that she did not know the identity of the shooter, and that she had heard from Kareem that Clinton was the shooter. Importantly, this testimony was not admitted for its truth, but rather only to assess the credibility of the witnesses' testimony. Defense counsel conceded at oral argument before this court that there was no substantive evidence that Clinton was the shooter. See footnote 5 of this opinion. Accordingly, we conclude that the court properly determined that the defendant was not entitled to a jury instruction on third-party culpability.

## III

Finally, the defendant claims that the court abused its discretion by permitting Nunez and Kareem to testify regarding the defendant's gang affiliation. In particular, the defendant argues that this evidence was improperly permitted because it constituted uncharged misconduct and did not fall within one of the exceptions provided by § 4-5 (c) of the Connecticut Code of Evidence.[6] Moreover, the defendant argues that the evidence was unduly prejudicial and that its prejudicial effect outweighed its probative value. We decline to reach this claim because the defendant failed to brief whether the admission of this testimony constituted harmful error. Accordingly, we deem the claim abandoned.

The following additional facts and procedural history are relevant to our resolution of this claim. Prior to trial, the state filed a notice of uncharged misconduct evidence, indicating that it intended to present evidence of the defendant's gang affiliation. The defendant objected to admission of such evidence, and the court deferred ruling on the evidentiary issue. Thereafter, prior to the start of trial, the court directed that, until it had ruled on an offer of proof outside the jury's presence, witnesses were not to mention the defendant's gang affiliation. The court stated that it would consider each offer of each witness' testimony individually, and would not make a blanket ruling on the issue.

At trial, during Nunez' direct examination, the state asked for the jury to be excused and, outside the jury's presence, notified the court that it anticipated asking Nunez about the defendant's gang affiliation. The state then examined Nunez outside the presence of the jury, where she stated that she had not reported the shooting to the police on the night it occurred because she was afraid "that somebody would do something to [her]." When asked who she meant by "somebody," she replied, "the Bloods." After hearing this proffer, the court ruled that it would allow the examination, but that it would

provide a limiting instruction. The jury returned and the prosecutor elicited the proffered testimony from the witness that implied that the defendant was a member of the Bloods.[7]

Kareem also testified that the defendant was in a gang. There was a proffer of this testimony outside the presence of the jury before it was admitted. At the request of defense counsel, when the prosecutor questioned the witness he specifically used a transcript of the approved questions from the proffer.

We now turn to the relevant law. "Evidence of a defendant's uncharged misconduct is inadmissible to prove that the defendant committed the charged crime or to show the predisposition of the defendant to commit the charged crime. . . . Exceptions to this rule have been recognized, however, to render misconduct evidence admissible if, for example, the evidence is offered to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. . . . [Because] the admission of uncharged misconduct evidence is a decision within the discretion of the trial court, we will draw every reasonable presumption in favor of the trial court's ruling. . . . We will reverse a trial court's decision only [if] it has abused its discretion or an injustice has occurred. . . .

"It is well settled that, absent structural error, the mere fact that a trial court rendered an improper ruling does not entitle the party challenging that ruling to obtain a new trial. An improper ruling must also be harmful to justify such relief. . . . It is a fundamental rule of appellate review of evidentiary rulings that if [the] error is not of constitutional dimensions, an appellant has the burden of establishing that there has been an erroneous ruling [that] was probably harmful to him. . . . We do not reach the merits of [a] claim [if] the defendant has not briefed how he was harmed by the allegedly improper evidentiary ruling." (Citations omitted; internal quotation marks omitted.) *State* v. *Toro*, 172 Conn. App. 810, 815–17, 162 A.3d 63, cert. denied, 327 Conn. 905, 170 A.3d 2 (2017)

"[W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise per-

mitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) Id., 817.

Although the defendant in his brief discusses the prejudicial effect of the evidence that he was a member of a gang, he does so in the context of arguing that the evidence was inadmissible because its prejudicial effect outweighed its probative value. What the defendant has failed to do, however, is to analyze whether the allegedly erroneous admission of this evidence deprived him of a fair trial, in other words, that the admission of the evidence constituted harmful error.

As the court noted in *State* v. *Toro*, supra, 172 Conn. App. 819, the concept of the prejudicial effect of evidence and whether its admission constitutes harmful error "may overlap with one another to some extent, [but they] are not necessarily equivalent and must be briefed separately. . . . Indeed, it is not inconsistent for a reviewing court to conclude that, although evidence was unduly prejudicial, and thus improperly admitted at trial, its improper admission nevertheless was harmless." (Citation omitted.)

In the present case, beyond summarily concluding that the court's decision to allow witness testimony regarding the defendant's gang affiliation prejudiced him, and stating in his reply brief that "[t]his error is not harmless because it painted the defendant in a very negative and violent light," the defendant has failed to address the issue of whether the alleged error was harmful in light of the evidence as a whole and the court's limiting instruction. The defendant has the burden of demonstrating that the court's allegedly improper ruling likely affected the outcome of the trial.

"[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Citation omitted; internal quotation marks omitted.) *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016). Because the defendant has failed adequately to brief the question

of whether the allegedly erroneous admission of his membership in a gang was harmful, we deem his claim abandoned. See id.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] For jurisprudential reasons, we address the sufficiency of the evidence claim first, although this differs from the order the claims were presented by the defendant in his principal appellate brief.

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[3] The court provided the following limiting instruction: "The testimony that you heard today from Ms. Nunez, from [Kareem], and most recently just now from Ms. Martinez, again, that testimony related to alleged prior consistent and inconsistent statements made by other individuals. Therefore, the only thing you could use those statements for is for credibility. You cannot use them for substantive purposes to the truth of their content.

"This is the situation under our rules that statements that were or were not made—allegedly were or were not made go to the credibility of that witness, not to the substance of what the person may or may not have said. So it's limited to credibility. It's not for the truth of the matter asserted in the counts."

[4] Witnesses at the trial frequently referred to Daniel Clinton by the nicknames of "Country" and "DaDa."

[5] The panel at oral argument before this court asked defense counsel whether there was "any evidence in this record that you say supports a third-party culpability instruction where the evidence was admitted for something other than impeachment purposes?" Defense counsel replied, "There was none, Your Honor."

[6] Section 4-5 (c) of the Connecticut Code of Evidence provides in relevant part: "Evidence of other crimes, wrongs or acts of a person is admissible . . . to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony."

[7] The court provided the following limiting instruction: "There are certain circumstances under which evidence is admitted for a limited purpose only. The testimony that you just heard about any relationship to a gang is admitted solely for purposes of establishing why this witness did not give a statement earlier than the time that she did, that's the only thing that it's admitted for, nothing else, it's limited to that purpose, you can use it for nothing else."