******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* BENJAMIN
CHASE CARPENTER
(AC 41888)

Lavine, Prescott and Harper, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of murder and arson in the second
degree, the defendant appealed. The defendant's conviction stemmed
from an incident in which he entered the home of the victim, A, cut her
throat, and set her home on fire. The defendant then met with D, and
D led the defendant to a location that he felt was a safe place for the
defendant to abandon A's car, which the defendant then set ablaze. On
appeal, the defendant claimed that certain evidence entitled him to an
instruction on the third-party culpability of D. *Held* that the trial court
properly declined to give the requested jury instruction on third-party
culpability because the evidence was insufficient to establish a direct
connection between D and either the murder of A or the arson of
A's home: although the defendant claimed that cell phone site data
introduced into evidence through W, an agent with the Federal Bureau
of Investigation, showed that D may have been at or near A's home
within minutes of when a witness, S, had been awakened by the sound
of car doors closing before A's home was consumed by fire, there were
no witnesses who placed D at A's home, and the defendant ignored W's
testimony that there was no evidence suggesting that either D or his
cell phone were ever at A's home; moreover, the mere possibility that
D might have been in the area did not warrant an instruction on third-
party culpability, as the purported evidence did not show physical pres-
ence combined with opportunity, nor did it show physical evidence and
a lack of similar physical evidence linking the defendant to the scene,
and W's review of the cell phone records actually placed the defendant
near A's home multiple times; furthermore, even though D had accurate
knowledge about the nature of the victim's fatal wounds, which informa-
tion had not been released to the public, by the defendant's own admis-
sion D's knowledge could have been secondhand knowledge he received
from the defendant himself, D's own testimony that he heard the informa-
tion from the defendant at another date and time supported that conclu-
sion, and even though D originally was charged with an arson related
offense with respect to the burning of A's car and avoided prosecution
by agreeing to testify against the defendant, the murder of A and the
arson of A's home occurred at a time and location different from the
arson of A's car, and it did not follow, in the absence of other evidence,
that D was involved directly with the other, more heinous crimes in
this case, as there was no direct evidence beyond bare suspicion that
another person murdered A or set fire to A's home.

(*One judge concurring*)

Argued September 17—officially released November 19, 2019

*Procedural History*

Substitute information charging the defendant with
the crimes of murder and arson in the second degree,
brought to the Superior Court in the judicial district of
New Haven and tried to the jury before *B. Fischer, J.*;
verdict and judgment of guilty, from which the defen-
dant appealed. *Affirmed.*

*Matthew C. Eagan*, assigned counsel, with whom
were *James P. Sexton*, assigned counsel, and, on the
brief, *Emily Graner Sexton*, assigned counsel, and *Dan-
ielle J.B. Edwards*, assigned counsel, for the appel-
lant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, were *Patrick Griffin*, state's attorney, and *Seth Garbarsky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Benjamin Chase Carpenter, appeals from the judgment of conviction, rendered after a jury trial, of murder and arson in the second degree. The defendant claims that the trial court erred in failing to instruct the jury, as he requested, on third-party culpability. We disagree with the defendant and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Early on the night of December 25, 2015, the defendant communicated with Jennifer Antonier, the victim in this case, who was seeking to obtain narcotics from the defendant on "credit." Later on that night, the defendant reconnected with Antonier on the streets of his neighborhood. Specifically, Antonier, accompanied by an unidentified male, picked up the defendant in her Subaru Impreza and had him sit in the front passenger seat. At that time, Antonier was in the back seat of her car and the unidentified male was in the driver's seat. Once the defendant entered the car, the unidentified male began to drive, at which point Antonier held a gun to the defendant's head and demanded everything he had. After a brief altercation in the vehicle, during which the defendant admitted to punching Antonier, he was able to escape.

Later that same night, the defendant made his way back to Antonier's home located at 28 Lilac Avenue, Hamden (28 Lilac). Once he arrived, he punched Antonier in the face, took a knife that he regularly carried on his person, cut Antonier's throat two times, and severed her jugular vein. To ensure that Antonier would bleed out, the defendant then slashed her left arm with the knife, leaving a gaping wound that led to her almost immediate death.

After cutting Antonier, the defendant dragged her body up the stairs to the second floor landing. He then left and eventually returned with gasoline that he poured throughout 28 Lilac, including all over Antonier's body. Shortly thereafter, the defendant set the house ablaze and departed, taking Antonier's cell phone and car with him.[1]

In the early morning of December 26, 2015, the defendant connected with his cousin, Jerome Dixon, at Poor John's Pub (Poor John's). The defendant arrived at Poor John's by driving Antonier's car. Dixon testified that the defendant arrived with blood on his pants. While with Dixon, the defendant asked if he knew the best location to get rid of a car. Dixon confirmed that he did know of a place; however, before showing the defendant the location, Dixon elected to go purchase marijuana at a location away from Poor John's.

After Dixon completed his marijuana transaction, he drove back, heading for Poor John's, when he realized that he was being followed by the defendant. After

pulling over and having a brief conversation with the defendant, Dixon led the defendant to Russell Street in New Haven, a location he felt was a safe and dark place to abandon a car. Once they arrived at Russell Street, Dixon remained in his car and waited for the defendant. Through his rearview mirror, Dixon witnessed the defendant exit the Subaru Impreza and wipe down the steering wheel, door, and handle of Antonier's car.[2] Then, Dixon saw the defendant reach back into the Subaru as it lit up in flames, followed by the defendant jumping into the passenger side of Dixon's car.

Several hours later, in the afternoon of December 26, Dixon gave the defendant a ride to work. Before exiting the vehicle, the defendant asked Dixon to dispose of a bag containing the clothes that he wore the previous night. Dixon subsequently disposed of the bag at a gas station. A few days later, the defendant and Dixon met up again at Poor John's, during which time the defendant confessed to Dixon everything he did to Antonier at 28 Lilac and why.

The defendant became a person of interest for the Hamden Police Department's investigating detectives when they discovered that the last telecommunication Antonier had, either by phone call or through text message, was, in fact, with the defendant. Police suspicion of the defendant's involvement in Antonier's death grew stronger when he would not provide a straight answer as to his whereabouts on the night of the murder. Additionally, Harrington informed the police that the defendant had told her that he stabbed Antonier, and, through historical cell site analysis, Hamden police traced the defendant's cell phone to a location near 28 Lilac, as well as Gorham Avenue and Russell Street, on the night of the murder. Weeks later, on February 10, 2016, pursuant to a warrant, Hamden police arrested the defendant, and he was subsequently tried for the murder of Antonier and for having committed arson.

The defendant's trial began on April 3, 2017, and lasted five days. At the conclusion, the jury found the defendant guilty of murder and arson in the second degree.

Prior to the conclusion of trial, the defendant requested that the court provide the jury with a third-party culpability instruction, arguing that there had been direct evidence that a third party, and not the defendant, committed the crimes of which he was accused. The defendant argued the following evidence supported a third-party culpability instruction: (1) Antonier's neighbor, Timothy Snodgrass, heard multiple car doors shutting between midnight and 12:20 a.m. and a beeping noise during that time period; (2) Wines testified that Dixon's cell phone connected to cell towers in the area of 28 Lilac at 12:10 a.m.; (3) Dixon's testimony contained intimate knowledge of nonpublic details of the murder; and (4) Dixon's DNA was found

on a lighter.

The court denied the defendant's request for a third-party culpability instruction, citing *State* v. *Baltas*, 311 Conn. 786, 91 A.3d 384 (2014). The court opined that "[e]vidence that would raise only a bare suspicion that a third party rather than the defendant committed the charged offense would not be relevant to the jury's determination. In this particular case there's been no evidence that the third party knew [Antonier], that the third party was [at 28 Lilac] prior to or during the . . . alleged crime. There was no evidence, no physical evidence tying the third party, no fingerprints, no DNA, no weapons, no gasoline. The third party's connection is simply information allegedly received from the defendant, his cousin, who allegedly indicated to him some of the details about his alleged crime." This appeal followed. Additional facts will be set forth as necessary.

On appeal, the defendant claims that the trial court erred by denying his request to charge the jury regarding third-party culpability. Specifically, the defendant argues that the following evidence supported a third-party culpability instruction: (1) "cell phone site data shows that [Dixon] may have been at [28 Lilac] within minutes of the time that her neighbor, [Snodgrass], was awoken by car doors closing and moments before [28 Lilac] was consumed by fire"; (2) "[Dixon had] accurate knowledge about the nature of [Antonier]'s fatal wounds, which were not made public"; and (3) "[Dixon] was initially charged with an arson related offense in this case, and he was only permitted to avoid prosecution for that offense because he pleaded guilty to hindering the prosecution and tampering with evidence, and entered into a cooperation agreement with the state to testify against the defendant." The defendant also points to the fact that Dixon's testimony regarding the events of December 25, 2015, is unreliable because his story changed several times.

We first set forth the standard of review and applicable legal principles that guide our analysis. "In determining whether the trial court improperly refused a request to charge, [w]e . . . review the evidence presented at trial in the light most favorable to supporting the . . . proposed charge. . . . A request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, the trial court has a duty *not* to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence. . . .

"It is well established that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged. . . . The defendant

must, however, present evidence that *directly connects* a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused. . . .

"The admissibility of evidence of third party culpability is governed by the rules relating to relevancy. . . . Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . Accordingly, in explaining the requirement that the proffered evidence establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, we have stated: Such evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of third party culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt. . . . In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination. A trial court's decision, therefore, that third party culpability evidence proffered by the defendant is admissible, necessarily entails a determination that the proffered evidence is relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt. . . .

"[I]f the evidence pointing to a third party's culpability, taken together and considered in the light most favorable to the defendant, establishes a direct connection between the third party and the charged offense, rather than merely raising a bare suspicion that another could have committed the crime, a trial court has a duty to submit an appropriate charge to the jury." (Emphasis added; internal quotation marks omitted.) *State* v. *Abdus-Sabur*, 190 Conn. App. 589, 599–601, 211 A.3d 1039, cert. denied, 333 Conn. 911,    A.3d    (2019).

Recently, our Supreme Court provided further guidance as to what constitutes a sufficient direct connection for purposes of third-party culpability: "[T]his court has found that proof of a third party's *physical presence at a crime scene*, combined with evidence indicating that the third party would have had the *opportunity to commit the crime* with which the defendant has been charged, can be [sufficient]. . . . Similarly, this court has found the direct connection threshold satisfied for purposes of [third-party] culpability when *physical evidence links a third party to a crime scene* and there is a *lack of similar physical evidence linking the charged*

*defendant* to the scene. . . . Finally, this court has found that statements by a victim that implicate the purported third party, combined with a lack of physical evidence linking the defendant to the crime with which he or she has been charged, can sufficiently establish a direct connection for [third-party] culpability purposes." (Emphasis added; internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 330 Conn. 520, 565, 198 A.3d 52 (2019).

A close examination of the defendant's proffered evidence in support of his request for a third-party culpability instruction leads this court to only one conclusion: it is insufficient to establish a direct connection between Dixon and either the murder of Antonier or the burning of 28 Lilac.

The defendant first argues that Dixon *may* have been at 28 Lilac within minutes of when Snodgrass was awoken by the sound of car doors closing before Antonier's house was set ablaze. There were no witnesses, however, including Snodgrass, who placed Dixon at 28 Lilac. The only evidence the defendant points to in support of this allegation that Dixon was, in fact, at 28 Lilac, is the testimony provided by Wines. Specifically, the defendant identifies portions of Wines' testimony where he interprets the connection of Dixon's cell phone to various cell towers as indicative of movement throughout the night, thus suggesting that Dixon was at or near 28 Lilac. These averments, however, ignore Wines' direct and consistent testimony that, throughout the night, there was no evidence to suggest that either Dixon or his cell phone were ever at 28 Lilac.

Despite Wines' latter testimony, the mere possibility that Dixon might have been in the area does not fall within any of the examples recognized by our Supreme Court in *Johnson* v. *Commissioner of Correction*, supra, 330 Conn. 565. The defendant's purported evidence does not show physical presence combined with opportunity, nor does it show physical evidence *and* a lack of similar physical evidence linking the defendant to the scene—on the contrary, Wines' review of the cell phone records places *the defendant* near 28 Lilac multiple times throughout December 25 and December 26, 2015.

With regard to the defendant's second argument, namely, that Dixon had accurate knowledge about the nature of the victim's fatal wounds, which was information that was not released to the public, we are not persuaded that this meets the direct evidence standard described previously. By the defendant's own admission, Dixon's accurate knowledge could have been secondhand knowledge he received from the defendant himself, at any time during December 25 or 26, 2015, or during the many days thereafter that they were together. Dixon's own testimony, that he heard the information from the defendant at another date and time, supports

this conclusion.

The defendant's third argument for a third-party culpability instruction is that Dixon originally was charged with an arson related offense, but avoided prosecution on that offense and ultimately agreed to testify against the defendant. Again, we are not convinced that this constitutes direct evidence that would warrant a third-party culpability instruction.

Dixon was charged originally with conspiracy to commit arson in the second degree and conspiracy to tamper with evidence in relation to the burning of Antonier's car, not the burning of 28 Lilac. Although the crimes are related in that they involve the same victim, Antonier, the murder and arson of 28 Lilac occurred at a different time and in a different location from the burning of Antonier's car. Additionally, aside from Dixon's own admission that he was present at the burning of Antonier's car, there was ample evidence via historical cell site analysis and closed circuit television traffic cameras that linked him directly to the burning of the car, if not the location in which the burning occurred. Although the prosecutor elected not to charge Dixon with arson of Antonier's car, despite overwhelming evidence that he contributed to or was involved in that crime, it does not then follow, absent other evidence, that Dixon was involved directly with the other, more heinous crimes in this case.

Additionally, in his argument to the trial court and in his brief to this court, the defendant cites to our Supreme Court's decision in *State* v. *Arroyo*, 284 Conn. 597, 935 A.2d 975 (2007), as a case similar to the present one, urging us to conclude that there was sufficient evidence to warrant a third-party culpability instruction. The present case, however, is distinguishable from *Arroyo*.

In *Arroyo*, the defendant was convicted of, among other things, sexual assault in the first degree, sexual assault in the fourth degree, and risk of injury to a child involving a five year old girl who lived in a home at which the defendant occasionally slept. Id., 602, 607. The court in *Arroyo* found that there was direct evidence that implicated the child's father and not the defendant. Id., 610–11. Specifically, the court identified the following evidence: (1) there was a "secret" the girl would not talk about between the girl and her father; (2) she said the secret had something to do with her body and pointed on a doll to the region between the doll's "belly and genital area"; (3) she was ashamed and afraid to share the secret; (4) she engaged in secret games with her father; (5) she tested positive for chlamydia around the same time that her father came back home from being away; (6) her father initially refused to be tested for chlamydia; and (7) her "father showered with [the child] and helped her to wash her private area." Id., 611–13. The court opined that, despite being

a "close case," the aforementioned evidence "suggest[ed] a direct connection between the father and the sexual assaults of the victim," thus warranting a third-party culpability instruction. Id., 610, 612.

In the present case, unlike in *Arroyo*, there is *no direct evidence* beyond a bare suspicion that another person murdered Antonier or set fire to 28 Lilac. Accordingly, we conclude that the court properly declined to give a jury instruction on third-party culpability.

The judgment is affirmed.

In this opinion LAVINE, J., concurred.

[1] At some point during the night, most likely before setting fire to 28 Lilac, the defendant went to visit his cousin, Sharese Harrington, at her home, located at 88 Gorham Avenue, Hamden. He told Harrington that he punched Antonier and the unidentified man before running away. Harrington testified that she saw scrapes and cuts on the defendant's knuckles and, at that moment, he had a knife on his person. The Hamden Police Department enlisted the assistance of Special Agent James Wines with the Federal Bureau of Investigation to locate Antonier's cell phone, by way of historical cell site analysis. Through Wines' assistance, Hamden police located Antonier's cell phone in a storm drain outside 56 and 58 Gorham Avenue, approximately 300 feet from Harrington's home.

[2] During trial, Dixon described the car as a black, four door hatchback with a bike rack on top—a description matching Antonier's Subaru Impreza.