******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## ISMAIL ABDUS-SABUR *v.* COMMISSIONER OF CORRECTION
### (AC 46937)

Alvord, Suarez and Clark, Js.

*Syllabus*

The respondent, the Commissioner of Correction, appealed, on the granting of certification, from the habeas court's judgment granting in part the petitioner's habeas corpus petition, in which the petitioner claimed, inter alia, that he was actually innocent of the murder of the victim. The respondent contended that the court improperly concluded that M, the petitioner's trial counsel, had rendered ineffective assistance by failing to subpoena the petitioner's brother, I, and to present I's testimony that he had committed the murder. *Held*:

The habeas court improperly granted in part the habeas petition, as the petitioner failed to overcome the strong presumption that M's informed, strategic decision not to subpoena I or to present I's testimony was reasonable trial strategy, which the court improperly concluded amounted to deficient performance.

At the time of trial, it was reasonable for M to have concluded that I had been uncooperative and that his testimony would be unpredictable in light of I's steadfast, pretrial reluctance to meet with and to admit to M's investigators his responsibility for the crime, as well as I's failure to come forward at the petitioner's criminal trial and his avoidance in speaking about his role in the victim's murder until he was subpoenaed to testify at the habeas trial nine years later.

The habeas court also failed to consider, from M's point of view, the risk that I's testimony could corroborate that of the state's witnesses identifying the petitioner as the gunman or, if confronted with videos I had made in which he confessed to the crime, that I could testify that the videos were false and had been made at the petitioner's direction, which might have undermined the central theory of the defense case, which was that the state's witnesses were not credible.

Argued February 3—officially released July 1, 2025

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Bhatt, J.*; judgment granting the petition in part, from which the respondent,

on the granting of certification, appealed to this court. *Reversed in part*; *judgment directed*.

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Kelly Masi*, senior assistant state's attorney, for the appellant (respondent).

*Nicole P. Britt*, assigned counsel, with whom, on the brief, was *Christopher Y. Duby*, assigned counsel, for the appellee (petitioner).

*Opinion*

ALVORD, J. The respondent, the Commissioner of Correction, appeals from the judgment of the habeas court granting in part the third amended petition for a writ of habeas corpus filed by the petitioner, Ismail Abdus-Sabur. On appeal, the respondent claims that the court incorrectly determined that the petitioner's criminal trial counsel had rendered ineffective assistance by failing to subpoena and present the testimony of the petitioner's brother. We agree and, accordingly, reverse in part the judgment of the habeas court.

The following facts, as this court set forth in the petitioner's direct appeal from his conviction, and procedural history are relevant to our resolution of the present appeal. "On the evening of January 17, 2014, the [petitioner] was at an apartment on the third floor of a Waterbury housing complex known as 'Brick City.' The [petitioner's] friends, Arvaughn Clemente and Daniel Clinton, were hosting a house party at the apartment. The [petitioner's] brother, Isa Abdus-Sabur (Isa),[1] and

---

[1] At trial, the witnesses referred primarily to the individuals at Brick City at the time of the shooting by the following nicknames: the petitioner was known as "Get Rich" or "Rich," Isa was known as "Caesar" or "Ceez," Clemente was known as "Problem," and Clinton was known as "Country" or "DaDa."

Ryan Curry, Sthalron Freeman, and Katrina Montgomery were also in attendance. Clemente was dating Ja-Ki Calloway, who was also in the apartment. Calloway's father, Kareem Morey, Sr. (victim), rented a second floor apartment in the same complex, where he resided with his adult son, Kareem Morey, Jr. (Kareem). On the evening of January 17, 2014, his other son, Kentrell Morey, was also at the housing complex.

"That night, Calloway's brother, Kareem, learned that Clemente had assaulted Calloway, and became angry. Kareem and Kentrell then presented themselves at the third floor apartment and demanded that Calloway leave the apartment, but she refused. Kareem wanted to fight Clemente for having assaulted his sister. A verbal altercation then ensued between the Morey brothers and the men inside the apartment, which spilled onto the landing outside the apartment. The altercation escalated into a fistfight between a number of the party attendees and the Morey brothers.

"After the fight ended, the Morey brothers, upset by the altercation, left and walked to a nearby neighborhood to recruit additional people to renew the fight. They also called the victim, who had not been present at the initial altercation, and he informed them that he would return home. When the Morey brothers left, the partygoers returned to the third floor apartment. At this point, Montgomery overheard the [petitioner] mention a gun to the other men at the party.

"At about 10:30 p.m., the Morey brothers returned to Brick City with four additional men. Around this time, the victim also returned and parked his car on the street outside of the housing complex. The Morey brothers then entered the interior courtyard of Brick City through a passage from the street and climbed the stairs to the landing outside of Clemente and Clinton's third floor apartment. The victim remained standing at

ground level in the courtyard near the foot of the stairs. The Morey brothers began kicking Clemente and Clinton's apartment door. Eventually, the door to the apartment opened, but all the lights were off inside the apartment. Shortly thereafter, Kareem heard the 'click, click' sound of a gun. The Morey brothers then fled by descending the stairs toward the courtyard.

"As the Morey brothers retreated down the stairs, the occupants of Clemente and Clinton's apartment emerged onto the third floor landing overlooking the courtyard. Within the crowd on the third floor porch were the [petitioner], Isa, Clemente, Clinton, Curry, and Freeman. The [petitioner] then began firing a black handgun from the railing of the landing toward the people in the courtyard below.

"By the time the [petitioner] started shooting, the Morey brothers had arrived at the bottom of the stairs, where the victim was standing. When the victim heard the first gunshot, he pushed Kareem out of the way. The victim was then struck in the chest with a .45 caliber bullet. He told his sons that he had been hit and ran out of the courtyard through the passage toward his parked vehicle. The victim was driven to St. Mary's Hospital in Waterbury, where he later died as a result of the gunshot wound to his chest.

"Following the shooting, the [petitioner] and Isa ran to the [petitioner's] car and left Brick City. The next day, the [petitioner] and Isa pulled up in a sport utility vehicle [(SUV)] alongside Kentrell's girlfriend, Zyaira Cummings, while she was walking on a street near Brick City. The [petitioner] then said to Cummings, 'they're next,' which she interpreted to be a threat against the Morey brothers, whom she then warned about the interaction. On January 18, 2014, the day after the shooting, the [petitioner] fled to Southington. On January 21, 2014, the [petitioner] traveled to New York City. That

same day, the police obtained a warrant for his arrest. The [petitioner] eventually turned himself in on January 27, 2014." (Footnote added.) *State* v. *Abdus-Sabur*, 190 Conn. App. 589, 590–93, 211 A.3d 1039, cert. denied, 333 Conn. 911, 215 A.3d 735 (2019).

At trial, the petitioner was represented by Attorney Michael Moscowitz. "After a trial by jury, the [petitioner] was convicted of murder and criminal possession of a firearm. The court sentenced the [petitioner] to forty-five years of incarceration for his conviction of murder and two years of concurrent incarceration for his conviction of criminal possession of a firearm, for a total effective sentence of forty-five years of incarceration."[2] Id., 593.

The petitioner commenced the present habeas action in June, 2018. In his third amended petition, filed in February, 2023, the petitioner alleged four counts. In count one, the petitioner asserted a claim of actual innocence. In count two, the petitioner alleged that Moscowitz provided ineffective assistance of counsel by, inter alia, failing to pursue a third-party culpability defense implicating Isa as the shooter, failing to properly investigate whether Isa was the actual shooter, and failing to consult with or present the testimony of an expert on eyewitness identification.[3] In counts three

---

[2] The petitioner filed a direct appeal from his criminal conviction. He claimed that "(1) there was insufficient evidence to prove beyond a reasonable doubt that he possessed the specific intent to kill, as required for the crime of murder, (2) the trial court improperly denied his request for a third-party culpability instruction, and (3) that the court improperly admitted evidence of his gang affiliation." *State* v. *Abdus-Sabur*, supra, 190 Conn. App. 590. This court affirmed the judgment of conviction; see id., 606; and our Supreme Court denied the petitioner certification to appeal. See *State* v. *Abdus-Sabur*, 333 Conn. 911, 215 A.3d 735 (2019).

[3] The petitioner also alleged that Moscowitz had provided ineffective assistance by failing to challenge Cummings' account of the petitioner's threat on the day following the shooting and by failing to consult with or present the testimony of a cell phone records expert. The habeas court denied these claims.

and four, the petitioner alleged that his appellate counsel, Attorney Jodi Zils Gagne and Attorney Raymond Durelli, performed deficiently by failing to brief adequately a claim that the court improperly admitted evidence of the petitioner's alleged gang affiliation.

The habeas court, *Bhatt, J.*, held a trial on the petition in April and May, 2023. The court heard the testimony of Isa; the petitioner's sister, Aneesa Amatus-Sabur (Aneesa); the petitioner; Christina Lougal, the habeas investigator for the petitioner's counsel; James Olundsen, a digital forensics examiner; Durelli, who represented the petitioner in his direct appeal; Moscowitz; Ismael Perez, an investigator with the Office of the Public Defender in Waterbury; James Naccarato, an inspector with the conviction integrity unit of the Office of the Chief State's Attorney; and Paul Cicarella, an investigator for Moscowitz. The petitioner offered, and court admitted into evidence, two video recordings in which Isa took responsibility for the shooting (confession videos).[4]

Prior to testifying, Isa had been appointed counsel and was advised as to his fifth amendment right against self-incrimination. Isa testified that he was at a party at the third floor apartment in Brick City on the night of the shooting when a group of people arrived to fight his friend, Clemente. The fight happened outside and, after the group tried to "jump" Clemente, Isa and others joined the fight. Isa testified that the group left Brick City but then returned and kicked in the door of the third floor apartment. Isa testified that "somebody screamed gun" and Isa ran outside onto the third floor landing and "shot downwards" twice, but not at any particular person. He testified that the petitioner was behind the refrigerator at the time of the shooting. Isa testified that

---

[4] There are two confession videos because Isa recorded the video twice. As the habeas court found, the two videos are substantively the same.

he went home after the shooting and that Aneesa drove him to the train station the next day, where he traveled to New York and stayed for "[l]ike a month."[5] Isa testified that he did not know that anyone was hit by the gunfire until the petitioner called him about two days after the shooting and told him that the petitioner was going to be charged for the shooting. Isa told the petitioner that he would turn himself in and take responsibility for the shooting.

Isa testified that, before the petitioner's criminal trial, in 2014, Isa created, with Aneesa's help, the two confession videos, in which he took responsibility for the shooting.[6] Isa testified that he was concerned at the time about retaliation from the victim's family. Isa testified that he made the confession videos because the petitioner asked him to, and that he told the truth. Isa testified that he made the videos of his own free will and that no one threatened him or told him what to say. Isa testified that he had never brought the confession videos to the police but that he did tell Moscowitz' investigator about them before the petitioner's criminal trial. Isa testified that Moscowitz did not ask for a copy of the confession videos, and Isa did not show him the videos.

Isa further testified that he had spoken to Moscowitz' investigator, who told him that he would be called to testify at the petitioner's criminal trial but that he was not called to testify. Isa testified that he was not in hiding at the time and was never issued a subpoena. Isa testified that he did not attend the trial and that the

[5] On cross-examination, Isa testified that he had stayed in New York for about four months.

[6] Olundsen testified that he had reviewed the confession videos and saw no sign that they were manipulated or edited. Olundsen also testified that the date stamp on the videos was November 29, 2014, but, because the dates and times are set by the user of that particular camera, he was unable to verify the date stamp.

investigator, without explanation, told him not to come to the trial. Isa testified that he would have testified at the petitioner's criminal trial had he been asked to do so. Isa testified that he had told his mother and siblings that he was the shooter at about the time that the trial started.

Isa testified that, during the years following the shooting, he had phone conversations with an attorney more than twenty times and that the attorney had told him not to come forward or speak to anyone. Isa testified that, when contacted in 2020 by the habeas investigator, Lougal, he told her that he was the shooter.

Aneesa testified that she was not present on the night of the shooting but that she drove Isa to the train station the next day. Aneesa testified that Isa told her that something had happened, but did not tell her what. Aneesa testified that Isa eventually told her that he was the shooter. Aneesa testified that she first learned of Isa's involvement from Attorney Leslie Cavanagh, a public defender who initially was appointed, prior to Moscowitz, to represent the petitioner. Aneesa testified that she and her mother went to the public defender's office with Isa to speak with Cavanagh, but they were informed when they arrived that Cavanagh "would not be speaking to [them]."

With respect to the confession videos, Aneesa testified that "[i]t was asked of [Isa] to make the video[s] in case something were to happen to Isa. If, say, he was no longer here. That we would have this as evidence as to his doing this." When asked whether Isa made the videos willingly, she testified, "[f]or the most part, yes. . . . It wasn't forced" but that he had some "hesitation" and "apprehension." Aneesa testified that she did not share the confession videos with Moscowitz, the police, or the state's attorney's office but that Moscowitz was aware that they were available and did not ask for them.

Aneesa testified that Moscowitz "didn't much want to speak" to her when she tried contacting him and that his secretary at one point told her that she had Isa's name and that "Moscowitz was well aware of . . . Isa." Aneesa also testified that it was her understanding that Moscowitz was aware of the existence of the confession videos. Aneesa testified that she tried to talk to Moscowitz about what she knew but never brought up the videos with him. Aneesa testified that she did not speak with an investigator from Moscowitz' office. According to Aneesa, it was her understanding that she was "on the subpoena list, and none of us were called." Aneesa further testified: "[C]ountless times, Isa tried and attempted to meet with these counsel members that were representing [the petitioner] to make a statement. To take ownership. But it was always met with, hold on, just wait, oh, then come, no, hold on again. It was always this back and forth, back and forth situation."

The petitioner testified at the habeas trial that he was in the third floor apartment at the time of the shooting. The petitioner testified that he told Moscowitz at their first meeting that Isa was the shooter. According to the petitioner, he told Moscowitz about the confession videos on the "second or third court date with him," and he continued to mention the videos to Moscowitz throughout the whole time that Moscowitz represented him.[7] The petitioner testified that Moscowitz told him that his investigator had spoken with Isa. The petitioner testified that Moscowitz did not obtain the confession videos because he did not believe they were of value and that Moscowitz "had felt that he was going to be

---

[7] The petitioner also testified that he had told his appellate counsel that Isa was responsible for the shooting and that the confession videos existed. Durelli also testified that the petitioner had told him that he was innocent, that Isa had committed the crime, and about the existence of the videos. Durelli testified that he told the petitioner that he "should certainly raise [the issue] with his habeas attorney if and when the time came."

able to do whatever he was going to do without [them]." The petitioner testified that Moscowitz thought that no one would take the confession videos seriously. The petitioner testified that Moscowitz did not talk to Isa, any other family members, or anyone who was present at the shooting scene about Isa's involvement. He paraphrased Moscowitz' plan as wanting "to wait [until] trial and [for] lack of . . . better words, basically, spring [Isa's testimony] on the prosecution." The petitioner testified that Isa never was subpoenaed.[8]

Lougal testified that she first met with Isa in September, 2020, at which time he said that he was present during the shooting but did not state that he was the shooter. According to Lougal, she met with Isa a second time in November, 2020, and he admitted to her that he was the shooter and told her that he had thrown the gun in the East River in New York City.

Moscowitz testified that he had practiced law as a criminal defense attorney for more than thirty years. He testified that he was appointed to represent the petitioner and received the state's discovery but did not speak with or obtain the file from Cavanagh. Moscowitz hired two investigators, Joe DeMarco and Cicarella. Moscowitz reviewed a surveillance video of the location of the shooting (surveillance video) that had been obtained from a tenant of Brick City and testified that "[y]ou could not identify anyone from the video, but you could see all the figures and where they went." Moscowitz testified that his theory of the case was "[t]hat the individuals that identified [the petitioner] could not have identified him because they were not

---

[8] At his sentencing, the petitioner stated: "[E]ven though I've been convicted of killing [the victim], the conviction is wrong. I'm not responsible for his death. Throughout this case, I had believed the person responsible would have came forward, but that did not happen. So, at this time I stand before you to be punished for a crime I did not commit."

in a position on the landings to observe who was on the third landing."

Moscowitz testified that the petitioner told him that his brother "did the shooting and was going to come into court and testify to that factor." Moscowitz did not recall whether the petitioner had told him that Isa had confessed to other family members, and Moscowitz testified that he had "never heard" of videos in which Isa confessed. Moscowitz testified that he had met Isa only once; Isa approached him during jury selection and told him he was the petitioner's brother, but "he did not indicate he did—that he committed any murder, anything like that." Moscowitz testified that he told his investigators about Isa and that they tried to arrange an interview with Isa, but he never showed up. Moscowitz believed that the investigators had tried "at least five to six times to meet with [Isa], and he would never show up." Moscowitz testified that "we were trying to make contact with [Isa]—and we never made contact with him—because we wanted to know, did you commit the murder, and then prep him to do one of two things: either turn himself in to the police, which he never did, or to come in and testify, which he never did." Moscowitz did not recall speaking to any other family members but believed that his investigators spoke to family members in an effort to find Isa. Moscowitz testified that his investigators "went to [Isa's] location, but he was never there." Moscowitz testified that he believed his investigators "spoke to [Isa] over the phone and, once again, tried to meet with him. But that . . . was never fruitful."

Moscowitz testified that he did not subpoena Isa because "my client said his brother is going to come in, and we never—we only met him that one time, and that one time was out in front of the courthouse where he just left." Moscowitz testified that he would have subpoenaed Isa if he or his investigators could have

found him, but they could not find him. Moscowitz also stated: "I also, first, before I subpoenaed, wanted to find out whether he had, you know, committed the murder or not, and we didn't know that other than what [the petitioner] had told us." Moscowitz stated that he had "a questionnaire, that he was going to ask [Isa] questions if he did take the [witness] stand." Moscowitz testified that he filed, in accordance with his standard procedure, a motion to sequester witnesses, which he acknowledged would have prohibited Isa from entering the courtroom, but that Isa could have waited in the hallway. On cross-examination, Moscowitz again stated that he "never subpoenaed [Isa] because [he] wanted to speak to him first," and also acknowledged that "it would have been the best thing" for Isa to come in and tell him that he was the shooter.

When asked on cross-examination whether he would have used the confession videos if he had them, Moscowitz testified that he would have had to demonstrate Isa's unavailability: "If I could lay a proper foundation to introduce the video[s], because it's an interesting concept. A video comes in, I just can't throw it into evidence. . . . I have to lay a foundation. So, someone would have to testify that they were present when the— and they took the video. . . . I'd have to have a proper foundation because I know the state's attorney would have objected unless I laid a foundation."

Perez testified that he and Cavanagh met with the petitioner, who told them that he was innocent and that his brother was the shooter. Perez also testified that he had a vague recollection of the petitioner telling him that his brother had confessed to other family members. Perez testified that the petitioner did not tell him about any videos made by Isa. When asked whether Isa had made an attempt to come forward to the public defender's office, Perez stated: "I do remember at one point I became aware that he was going to come in. I think

he came in, and . . . Cavanagh, I assume was due to ethical reasons, she contacted one of the public defenders from the [geographical area court] . . . I think it was Attorney Terri Dalton—to speak to [Isa] first. And I don't know what they talked about. I'm sure maybe his rights were read or whatever, explained things. And the next thing I hear is that he left. So, that's all I remember.''

Naccarato testified that the conviction integrity unit of the Office of the Chief State's Attorney had received a request to open a case on the petitioner's behalf. Naccarato began working on the case in July, 2022. Naccarato testified: ''I had Isa's phone number, and I called him. I left a message [stating] who I was and why I was calling. I waited. Several weeks went by . . . with no response. I then found Aneesa's phone number, his sister. I contacted Aneesa and told her who I was and what I was doing, and that I wanted to speak to Isa. So . . . Aneesa said that she would speak to Isa and let him know, and so it was my understanding that I may get a call back from Isa.'' Naccarato testified that he called Isa again in September, 2022, and Isa said that he would come in, gave Naccarato a date, and said that he wanted to speak with his attorney and have his attorney contact Naccarato. Naccarato testified that he made one more attempt to contact Isa at the end of March, 2023.

Cicarella testified that he was hired to investigate the petitioner's criminal case in September, 2016. Cicarella testified that he was not aware of any videos in which Isa made a statement about the shooting. Cicarella testified that he spoke with Isa twice, once at Isa's home. Cicarella testified: ''[W]hen we spoke with him, anytime the conversation came up about who committed this crime or did he do it—we asked it directly because we were told that he may have committed the crime by our client and, I believe, our client's sister—and at that

point he said he did not—would not answer it. He wanted to consult with his attorney. And we made a few other attempts to get a hold of him again to ask that or get him to come to court . . . .” Cicarella reiterated: “[He] did not answer the specific question about who committed the crime or if he committed the crime, and he said he would have to talk to his attorney.”

Isa was recalled to testify by the respondent’s counsel and again confirmed that he wanted to continue testifying and that he understood that there was no statute of limitations applicable to the crime of murder, for which he could be charged and imprisoned. Isa again testified that he was the shooter and that he got the gun from on top of the refrigerator. Isa testified that he did not recall being contacted by the conviction integrity unit. He also testified that he had spoken to Attorney Larry Hopkins, who advised him not to go to the police. Isa testified that, when he spoke with Moscowitz outside the courtroom, he did not tell Moscowitz that he was the shooter.

On August 29, 2023, the habeas court, *Bhatt, J.*, issued a memorandum of decision in which it granted in part and denied in part the habeas petition. The court rejected the petitioner’s actual innocence claim on the ground that Isa’s confession was not newly discovered evidence, explaining that it was “known to [the petitioner] that Isa would admit to being the real shooter and [that] Aneesa recorded Isa confessing to the crime.” The court also rejected the petitioner’s ineffective assistance of appellate counsel claims.

The habeas court found that Moscowitz performed deficiently by failing to pursue and introduce evidence of third-party culpability with Isa as the third party. The court first stated that it found Isa’s confession credible. It explained: “It is significantly compelling when an individual takes the [witness] stand against the advice of

counsel, waives their fifth amendment privilege against self-incrimination and confesses to committing a crime for which there is no statute of limitations and which exposes them to sixty years' incarceration. Isa appeared before this court, having been subpoenaed, and took the [witness] stand to admit to being the shooter. The court cannot disregard this without actual evidence demonstrating that the confession was false or not credible: for instance, physical evidence making his version of events not possible or the testimony of all the other witnesses and the state's theory being inconsistent with the proffered version or actual evidence of a credible motivation for him to fabricate and expose himself to sixty years' incarceration. The fact that Isa confessed twice under oath, subject to cross-examination and the penalty of, effectively, life in prison, significantly bolsters his credibility. Common factors that would undermine the credibility of Isa's confession are also not present: he was not a codefendant who was convicted of the same offense and has served or is serving his sentence; nor is he serving a lengthy sentence for another offense, thus leaving him with nothing to lose if he falsely admits to this crime to save his brother; and this is not a recent confession, made for the first time some nine years after the incident. There is no evidence that Isa suffers from some terminal illness that gives him incentive to lie about being the actual shooter nor of other potential motives that Isa could have. Further, the court notes that his version of events is generally consistent with what was presented at the criminal trial. Notably, it is undisputed that both he and [the petitioner] were present on the third floor shortly before the shooting. All of the above lead the court to find Isa's testimony credible." (Footnotes omitted.)

The habeas court also referenced the fact that the family of the petitioner and Isa attempted to have Isa meet with Cavanagh shortly after the petitioner's arrest,

but that Isa left the building after meeting with counsel. The court also found that the petitioner told Moscowitz that Isa would confess to the crime and that the confession videos were recorded on or about November 28 or 29, 2014. The court further found that the petitioner told Moscowitz about the confession videos well before 2017. The court found that Moscowitz' investigators knew where Isa lived but that Isa was not subpoenaed to testify at the criminal trial. The court rejected Moscowitz' explanation that he did not want to subpoena Isa before speaking to him as "not a valid reason for not subpoenaing Isa."

The habeas court acknowledged that Isa failed to follow up when Moscowitz and his investigator attempted to meet with him but nonetheless determined that the failure to subpoena Isa under such circumstances constituted deficient performance, citing decisions from other jurisdictions. The court found that, had Moscowitz subpoenaed Isa, he would have appeared, reasoning: "There is no evidence that Isa was in hiding or had fled the state. He was recalcitrant in talking to . . . Moscowitz' investigators, stating that he would have to consult with his own attorney before admitting to his involvement in the incident. However, he also testified that he did tell . . . Moscowitz' investigator about the videos he recorded. He was on the state's witness list, and there was a sequestration order prohibiting witnesses from being present during trial. It is also important to note that the one time Isa *was* subpoenaed to court—for this habeas trial—he appeared, consulted with counsel, took the [witness] stand against the advice of counsel and confessed under oath and subject to cross-examination to being the actual shooter. It is for that reason that the court also concludes that he would have testified in accordance with his videotaped confession and his testimony to this court that he was the real shooter." (Emphasis in original.) The court

further found that, even if Isa had invoked his privilege against self-incrimination at the criminal trial, the confession videos would have been admissible as substantive evidence as a statement against penal interest.

Finally, the habeas court concluded that the petitioner was prejudiced by Moscowitz' "failure to present Isa's confession to the jury . . . ." Accordingly, the court granted the petition in part. On September 5, 2023, the court granted the respondent's petition for certification to appeal.[9] This appeal followed.

We first set forth guiding principles of law, as well as our standard of review, which are well settled. "A criminal defendant's right to the effective assistance of counsel extends through the first appeal of right and is guaranteed by the sixth and fourteenth amendments to the United States constitution and by article first, § 8, of the Connecticut constitution. . . . To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington,* [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong. . . .

---

[9] On September 8, 2023, the habeas court granted the petitioner's petition for certification to appeal. Although the petitioner filed an appeal challenging the court's rejection of his actual innocence claim, he subsequently withdrew that appeal.

"On appeal, [a]lthough the underlying historical facts found by the habeas court may not be disturbed unless they [are] clearly erroneous, whether those facts constituted a violation of the petitioner's rights [to the effective assistance of counsel] under the sixth amendment is a mixed determination of law and fact that requires the application of legal principles to the historical facts of [the] case. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard. . . .

"Because our resolution of the present case turns on our review of the performance prong, some additional explication of that prong is necessary. In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable. . . . Nevertheless, [j]udicial scrutiny of counsel's performance *must be highly deferential.* It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court *must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance*; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action *might* be considered sound trial strategy. . . .

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. . . . At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. . . .

"Inasmuch as [c]onstitutionally adequate assistance of counsel includes competent pretrial investigation . . . [e]ffective assistance of counsel imposes an obligation [on] the attorney to investigate all surrounding circumstances of the case and to explore all avenues that may potentially lead to facts relevant to the defense of the case. . . .

"Nevertheless, strategic choices made after thorough investigation of law and facts relevant to plausible options *are virtually unchallengeable*; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

"The reasonableness of counsel's actions may be determined or substantially influenced by the [petitioner's] own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the [petitioner] and on information supplied by the [petitioner]. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that

support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. . . .

"Defense counsel will be deemed ineffective only when it is shown that a defendant has informed his attorney of the existence of the witness and that the attorney, without a reasonable investigation *and without adequate explanation*, failed to call the witness at trial. The reasonableness of an investigation must be evaluated not through hindsight but from the perspective of the attorney when he was conducting it. . . . Furthermore, [t]he failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense. . . .

"[O]ur habeas corpus jurisprudence reveals several scenarios in which courts will not second-guess defense counsel's decision not to investigate or call certain witnesses or to investigate potential defenses, [including] when . . . counsel learns of the substance of the witness' testimony and determines that calling that witness is unnecessary or potentially harmful to the case. . . .

"[T]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . . The United States Supreme Court has cautioned that a reviewing court, in considering whether an attorney's performance fell below a constitutionally acceptable level of competence pursuant to

the standards set forth herein, must properly apply the strong presumption of competence that *Strickland* mandates and is *required* not simply to give [trial counsel] the benefit of the doubt . . . but *to affirmatively entertain the range of possible reasons* [*that*] *counsel may have had for proceeding as* [*he*] *did.* . . . This strong presumption of professional competence extends to counsel's investigative efforts . . . as well as to choices made by counsel regarding what defense strategy to pursue." (Citations omitted; emphasis in original; footnotes omitted; internal quotation marks omitted.) *Jordan* v. *Commissioner of Correction*, 197 Conn. App. 822, 829–34, 234 A.3d 78 (2020), aff'd, 341 Conn. 279, 267 A.3d 120 (2021).

With the foregoing legal principles in mind, we turn to our discussion of the merits of the respondent's claim on appeal. The respondent claims that the habeas court improperly determined that Moscowitz had rendered ineffective assistance of counsel by failing to subpoena and present the testimony of Isa at the petitioner's criminal trial. Our de novo consideration of whether Moscowitz' decision not to subpoena and present the testimony of Isa was objectively reasonable under the circumstances requires a comprehensive discussion of the evidence presented to the jury at the criminal trial.

At the petitioner's criminal trial, the state presented the testimony of Cindy Nunez, who lived in the second floor apartment with her former boyfriend, Taquan Price, Kentrell, and Kareem. The victim sometimes also stayed in the second floor apartment. Nunez testified that, on the night of the shooting, Kareem "got jumped" upstairs and said that Kentrell was going to call their father and get some people to return upstairs to settle the fight. Nunez recalled hearing a car horn and looked outside and saw the victim's car. Nunez testified that she went outside to the second floor porch and saw Kareem, Kentrell and about four other people run up

the stairs and kick open the third floor door. Clinton exited the third floor apartment, with about six or seven people following behind him, and Clinton was yelling at Kareem and Kentrell. Kareem wanted to fight Clemente. The petitioner, who Nunez had seen on four occasions prior to the shooting, was one of the people exiting the third floor apartment. Nunez testified that she saw the petitioner on the third floor porch holding a handgun. She saw a flash from the gun, heard a loud boom and looked down and saw that her leg was bleeding. Nunez testified that she heard three gunshots. Price told her that the victim had been shot. Nunez went to the hospital to see what happened but did not seek medical treatment and, after waiting for a while, went home.

Nunez testified that she did not give a statement to the police on the night of the shooting because she was scared that the Bloods were going to "do something" to her. A few days after the shooting, detectives stopped Nunez on the street and told her that she needed to go with them to the police station to give a statement. Nunez identified the petitioner in a sequential photographic array. Nunez testified that Isa was at Brick City on the night of the shooting, but she did not know whether he was present on the third floor porch at the time of the shooting.

On cross-examination, Nunez testified that she told a former friend, Queyla Martinez, on the day of the shooting that she had heard two gunshots and that she did not see who had fired the gun. On redirect examination, Nunez explained that she had lied to Martinez when she told her that she did not see who fired the gun, but that she "didn't want to talk about it with anyone" and confirmed that she was sure that it was the petitioner who had the gun. Nunez was recalled by the state and testified that she told Martinez that Kareem said that it was Clinton who had shot the victim.[10]

---

[10] The state recalled Kareem, who testified that he had never told Nunez that Clinton shot the victim. The petitioner presented the testimony of

Nunez repeated her testimony that she saw the petitioner shoot the gun.

The state also presented the testimony of Cummings, who stated initially that she did not want to testify and was scared. She testified that she went to Brick City on the night of the shooting. Along the way, she saw knives and picked them up and put them in her boots. When she arrived at Brick City, she saw the victim getting out of his car and gave him a knife. She testified that, after walking into Brick City, she heard gunshots coming from the third floor. She saw the victim push Kareem to the floor and heard the victim say that "he was hit." Cummings testified that she had known of the petitioner for about three years. She testified that she saw the petitioner, Isa, and others on the third floor. She testified that she saw a gun, about eight and one-half inches in length, but did not testify as to who was holding the gun. After the victim was brought to the hospital, Cummings went to the hospital and later to the police station and gave a statement. Cummings testified that she lied in her first statement to the police when she told them that she was not present for the shooting. Cummings testified that, on the day after the shooting, a silver SUV drove up next to her, and the petitioner rolled the window down and said, "they're next," and then drove away. Isa also was in the car with the petitioner. Cummings testified that she warned Kentrell and Kareem of this threat.

On cross-examination, Moscowitz questioned Cummings regarding her statements to the police on January 18 and 19, 2014. With respect to the January 18 statement, Cummings testified that she had told the police that she was on Willow and Johnson Streets, which are not near Brick City, when she heard the gunshots.

---

Martinez, who testified that Nunez had told her on or about January 18 or 19, 2014, that Nunez did not know who shot from the third floor porch but also told her during the same time period that Clinton was the shooter.

Cummings testified: "I indicated that that whole statement was false." Cummings testified that she told the truth in her January 19 statement to the police, in which she stated that she did not see who was shooting but she knew that it was coming from the third floor porch. Cummings testified that she did not see Nunez in the courtyard.

Pursuant to a capias, Kareem appeared and testified that he and Kentrell had gotten into a fight with the petitioner, Isa, and others. Kareem left to get more people and called the victim. Kareem returned to Brick City, went upstairs to the third floor porch, and kicked open the apartment door. The lights were off in the third floor apartment. Kareem testified that he called Clemente out of the apartment to have a fistfight. Kareem testified that Kentrell pulled him back from the door of the third floor apartment and, when he got down to the courtyard, looked up and saw the petitioner and Isa on the third floor porch. The victim and others were present in the courtyard. Kareem testified that he heard gunshots and saw the petitioner holding a gun that was "pointed right down." Kareem testified: "[T]he bullet was really meant for me, but [the victim] ended [up] pushing me out the way . . . ." Kareem testified that he saw the petitioner and Isa run away and leave in a silver Nissan SUV, and that he tried to run after the vehicle. Kareem then went to the hospital.

Kareem gave a statement to the police on the night of the shooting and a second statement a few days later. Although he told the police that he saw the petitioner, Isa, and others inside the third floor apartment when the door opened, he testified at trial that he did not recall seeing them inside. Kareem also testified that he did not tell the police when he gave them his first statement that he had seen who shot the victim. When he gave his second statement, he told the police that the petitioner shot the victim. Kareem testified that he

did not tell the police at first because he was scared of the petitioner, who was in a gang, and felt like he "was next."[11]

On cross-examination, Kareem testified that Nunez did not live with him. Kareem further testified that the petitioner and Isa look alike because they are brothers. Kareem stated that he had only seconds, not minutes, to look upstairs from the courtyard to the third floor, and acknowledged that it was "dark up there"[12] and that two of the three men he saw, the petitioner and Isa, looked very similar. Kareem testified that, during the next two days following the shooting and before he returned to the police department on January 21, 2014, to give his second statement, he had heard "on the street" that it was the petitioner who had shot the victim. On redirect examination, Kareem reiterated that he had seen the man who shot the victim and that there was no doubt in his mind that it was the petitioner.[13]

[11] On cross-examination, Kareem testified that he also was afraid of being arrested.

[12] On redirect examination, Kareem testified that there was enough light to see the third floor. Justin Rodriguez also was present at Brick City on the night of the shooting and testified at trial pursuant to a capias. On cross-examination, he testified that it was dark on the third floor porch and that he did not see who fired the gun. Rodriguez testified that he was on the second floor, behind the staircase and next to Nunez, at the time of the shooting. Rodriguez' statement to the police included the following: "Another guy named Rich [the petitioner's nickname] was there, too, but he wasn't fighting like those other guys. He just . . . kept telling them to get them every time Kareem and Kentrell got loose." At trial, Rodriguez testified that he did not know anyone named Rich and did not recognize the petitioner.

[13] Gary Pelosi, an inspector with the Division of Criminal Justice, testified that he had met with Kareem. Pelosi testified that Kareem reviewed the statement in which he identified the petitioner as the shooter and reaffirmed that it was correct. Pelosi testified that, when he informed Kareem that he would have to testify regarding the statement and its truthfulness, Kareem's demeanor changed and he said that the portion of this statement in which he identified the petitioner as the shooter was not true and that he did not know who the shooter was. Pelosi testified that he met with Kareem a second time and that Kareem said that the petitioner was the shooter, and that he was afraid and did not want to testify.

During closing argument, Moscowitz argued that the state's case centered on Nunez and Kareem[14] and emphasized to the jury the conflicting testimony the state had presented. With respect to Nunez, Moscowitz advanced the argument that she could not have seen the shooter because her view was blocked by the stairs. Moscowitz urged the jury to examine closely the surveillance videos and suggested to the jury: "You'll have to play it yourself and you'll be able to position people as to where they were and how fast this happened, and that would be as to how it was—someone was able to observe anything since it happened so fast." Moscowitz also reiterated Nunez' testimony that she had lied to Martinez that she did not know who shot the victim. Moscowitz also highlighted that Kareem first told the police that he did not know who shot the victim and that there was evidence that Kareem told Nunez that Clinton was the shooter.

During its deliberations, the jury sent a note asking to review portions of Nunez' testimony, including "where she was standing," "who was holding the gun and where the gun was pointed toward," and "what she heard during [the] shooting event." The jury also asked how many statements Nunez gave to the police and when she gave them, and asked to rewatch a portion of the surveillance video.

Having set forth the evidence presented at the criminal trial, we turn to the respondent's specific arguments on appeal. The respondent argues that the habeas court improperly determined that the petitioner had satisfied his burden of demonstrating that Moscowitz' conduct fell outside the wide range of reasonable professional assistance. We agree with the respondent that the petitioner failed to demonstrate that Moscowitz' informed,

---

[14] Similarly, the prosecutor argued in closing argument: "Ultimately, this case comes down to the credibility of . . . Nunez and . . . [Kareem]."

strategic decision not to pursue Isa's testimony reflected deficient performance.[15]

We take as the starting point of our analysis the principle that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . In reconstructing the circumstances, a reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he] did . . . . Accordingly, our review of the petitioner's claim requires us, first, affirmatively to contemplate the possible strategic reasons that might have supported trial counsel's [decision not to have the witness testify] . . . and, second, to consider whether those reasons were objectively reasonable." (Internal quotation marks omitted.) *Godfrey-Hill* v. *Commissioner of Correction*, 221 Conn. App. 526, 537, 302 A.3d 923, cert. denied, 348 Conn. 929, 304 A.3d 861 (2023).

In the present case, Moscowitz testified about his reason for not subpoenaing Isa or presenting Isa's testimony. See id., 544 ("[w]hether to call a particular witness at trial . . . is a tactical decision for defense counsel, and, to the extent that the decision might be considered sound trial strategy, it cannot be the basis of a finding of deficient performance" (internal quotation marks omitted)). Specifically, Moscowitz testified that

---

[15] In light of our resolution of this claim, we need not address the respondent's remaining arguments, including that the habeas court improperly applied a per se rule of conduct in its memorandum of decision when it stated that, "[w]hen a defense attorney develops evidence that another person may have committed the crime, he or she is duty-bound to pursue it and call witnesses at trial to attempt to show it." (Internal quotation marks omitted.)

he "never subpoenaed [Isa] because [he] wanted to speak to him first." He reiterated that, although the petitioner had told him that Isa was responsible for the shooting, Moscowitz and his investigators had tried to contact Isa "because we wanted to know, did you commit the murder, and then prep him to do one of two things: either turn himself in to the police, which he never did, or to come in and testify, which he never did."

As the habeas court recognized in its memorandum of decision, Isa, after attempting to meet with Cavanagh, who was the petitioner's counsel at that time, and being redirected to meet with alternative counsel from the public defender's office, "left the building and did not provide a confession to . . . Cavanagh or her investigator." Additionally, the court found that "the evidence [demonstrated] that Isa failed to follow up when . . . Moscowitz and his investigator attempted to meet and speak prior to trial." The court also found that Isa was "recalcitrant in talking to . . . Moscowitz' investigators, stating that he would have to consult with his own attorney before admitting to his involvement in the incident." Finally, the court recognized that Isa "failed to come forward at the criminal trial" and "avoid[ed] speaking to anyone about his role until he was subpoenaed to testify some nine years later . . . ."

These findings were supported by the evidence presented at the habeas trial, including the testimony of Cicarella, who spoke with Isa twice. As noted previously, Cicarella testified that, when the question of who committed the crime was posed, Isa would not answer and wanted to consult with his attorney. Moscowitz believed that the investigators had tried "at least five to six times to meet with him, and he would never show up." Moreover, on the one occasion that Isa spoke with Moscowitz, he again did not indicate any involvement in the crime.[16] Thus, at the time of trial, it would

---

[16] The habeas court concluded that Moscowitz' reason for not subpoenaing Isa was not "valid . . . ." Given the circumstances of the present case,

be reasonable for Moscowitz to have deemed Isa unco-operative. See *Johnson* v. *Commissioner of Correction*, 330 Conn. 520, 567 n.21, 198 A.3d 52 (2019) ("[w]e are required to review defense counsel's performance on the basis of counsel's perspective at the time, not on the basis of hindsight" (internal quotation marks omitted)).

Faced with Isa's steadfast reluctance to meet with the investigators and his unwillingness to admit respon-sibility for the crime, Moscowitz reasonably could have determined that Isa's testimony would be unpredictable and, therefore, not helpful to the petitioner's defense. Cf. *Godfrey-Hill* v. *Commissioner of Correction*, supra, 221 Conn. App. 545 ("[counsel] reasonably could have concluded that the benefit of presenting [the witness'] testimony was outweighed by any damaging effect it might have" (internal quotation marks omitted)); see also, e.g., *Bowens* v. *Commissioner of Correction*, 104 Conn. App. 738, 743, 936 A.2d 653 (2007) (rejecting claim that counsel's failure to subpoena witness whose testimony potentially would be exculpatory constituted ineffective assistance when counsel viewed witness as "reluctant," in that she declined to provide written state-ment to investigating police officers, failed to speak with prosecutor after defense counsel encouraged her to do so, and had provided defense counsel with incon-sistent testimony), cert. denied, 286 Conn. 905, 944 A.2d 978 (2008).

Notably, in concluding that Moscowitz' performance was deficient, the habeas court limited its consideration to only the possibilities that Isa, once subpoenaed, either would have testified that he was the shooter or would have invoked his fifth amendment privilege against self-incrimination, which may have allowed

including the court's findings that Isa was recalcitrant and repeatedly failed to tell Moscowitz or his investigators that he was the shooter, we disagree with the court that Moscowitz' reason for proceeding as he did was not valid.

Moscowitz to introduce the confession videos into evidence.[17] The habeas court did not, however, consider, that from Moskowitz' point of view, there was a risk that Isa could further corroborate the state's witnesses in identifying the petitioner as the shooter or, if confronted with his confession videos, testify that they were false and made at the petitioner's direction.[18] "[O]ur habeas corpus jurisprudence reveals several scenarios in which courts will not second-guess defense counsel's decision not to investigate or call certain witnesses or to investigate potential defenses, such as when . . . counsel learns of the substance of the witness' testimony and determines that calling that witness is . . . potentially harmful to the case . . . ." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 166 Conn. App. 95, 141, 140 A.3d 1087 (2016), aff'd, 330 Conn. 520, 198 A.3d 52 (2019).

Finally, Moscowitz actively pursued a defense that relied on demonstrating the weaknesses in the state's

[17] The habeas court credited the petitioner's testimony that he had told Moscowitz about the confession videos before 2017. The court found that Durelli's testimony that the petitioner had told Durelli about the confession videos supported the petitioner's credibility. The court did not credit the testimony of both Moscowitz and Cicarella that they were not told about the existence of the confession videos. Perez also testified that no one had told him about any confession videos. On appeal, the respondent does not claim that the court's factual finding that Moscowitz was aware of the confession videos was clearly erroneous.

[18] As noted previously, the habeas court credited Isa's confession and testimony at the habeas trial that he would have come to court had he been subpoenaed. This finding does not preclude, in our evaluation of whether Moscowitz' decision not to subpoena Isa was objectively reasonable, the consideration of the risks that Moscowitz reasonably could have perceived as to Isa's potential testimony at the time of the criminal trial, given Isa's "recalcitrance" at that time. See *Michael T.* v. *Commissioner of Correction*, 319 Conn. 623, 632, 126 A.3d 558 (2015) ("[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time" (internal quotation marks omitted)).

case. As this court previously has stated, "[t]o support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." (Internal quotation marks omitted.) Id. Moscowitz reasonably could have determined that Isa's testimony, if he had corroborated that of the state's witnesses or disputed the accuracy of his confession videos, might have undermined the central theory of the defendant's case, namely, that neither Nunez nor Kareem were credible. Moscowitz testified that the defense strategy was to discredit Nunez and Kareem on the ground that they could not have seen the shooter from their vantage points. To support his defense theory, Moscowitz engaged in extensive cross-examination of both witnesses. In closing argument, Moscowitz highlighted the inconsistencies and forcefully urged the jury to rewatch the surveillance video. Significantly, in evaluating the strength of the state's case to determine whether the petitioner had proven prejudice, the habeas court recognized that the "testimony and identifications [of Nunez and Kareem] had been questioned and impeached," and that the "eyewitness' opportunity to view the actual showing was brief, in dark lighting conditions." The habeas court further noted that the jury sought detailed playback of witness testimony, namely, Nunez' testimony, and asked to rewatch the surveillance video. Our appellate courts "have recognized that a request by a jury may be a significant indicator of their concern about evidence and issues important to their resolution of the case." (Internal quotation marks omitted.) *State* v. *Devalda*, 306 Conn. 494, 510, 50 A.3d 882 (2012).

On the basis of the foregoing, we conclude that the petitioner did not meet his burden of overcoming the strong presumption that Moscowitz' decision not to

subpoena or present the testimony of Isa was reasonable trial strategy. Thus, we further conclude that the habeas court improperly concluded that Moscowitz' decision amounted to deficient performance under the *Strickland* standard. In light of our conclusion, we need not address the second prong of the *Strickland* test, namely, whether the petitioner was prejudiced by Moscowitz' decision.

The judgment is reversed only with respect to the habeas court's determination that Michael Moscowitz provided ineffective assistance of counsel by failing to subpoena and present the testimony of the petitioner's brother and the case is remanded to the habeas court with direction to render judgment denying the petition as to that claim; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.